## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN CRAIG, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CENTURYLINK, INC., GLEN F. POST, III and R. STEWART EWING, JR. <br><br> Defendants. | Case No. <u>17-CV-4740</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Benjamin Craig ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by CenturyLink, Inc. ("CenturyLink" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

### NATURE OF THE ACTION

1.     This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired CenturyLink common stock between March 1, 2013 and June 16, 2017, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      CenturyLink is an integrated communications company engaged primarily in providing an array of services to residential and business customers. Its communications services include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services.

3.      CenturyLink publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, regarding its unlawful business practices and its failure to comply with applicable laws and regulations.

4.      As the truth was fully revealed to investors, the Company's share price declined $1.23 per share from $26.95 per share of CenturyLink stock on June 15, 2017, to close at $25.72 per share on June 16, 2017, *a drop of approximately 4.5%.*

5.      As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased CenturyLink securities at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## JURISDICTION AND VENUE

6.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court

permissible under traditional notions of fair play and substantial justice.

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

## PARTIES

9.    Plaintiff purchased CenturyLink common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

10.    Defendant CenturyLink is incorporated in Louisiana and headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203. CenturyLink's common stock trades on the NYSE under the ticker symbol "CTL."

11.    Defendant Glen F. Post, III ("Post") was the Company's Chief Executive Officer ("CEO") and President at all relevant times.

12.    Defendant R. Stewart Ewing, Jr. ("Stewart") was the Company's Chief Financial Officer ("CFO"), Executive Vice President, and Assistant Secretary at all relevant times.

13.    Defendants in paragraphs 11-12 are collectively referred to herein as the "Individual Defendants."

14.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged

herein;

(d)      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)      was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)      approved or ratified these statements in violation of the federal securities laws.

15.      Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about CenturyLink's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

16.      As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific

requirements and obligations.

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CenturyLink's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CenturyLink common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CenturyLink's business, operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase CenturyLink securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

19.    CenturyLink is an integrated communications company engaged primarily in providing an array of services to residential and business customers. Its communications services

include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services.

20.     CenturyLink identifies itself as striving to maintain its customer relationships by, among other things, bundling its service offerings to provide its customers with a complete offering of integrated communications services.

21.     CenturyLink represents itself as a Company proscribing to the written codes of ethics and business conduct contained in the Company's corporate compliance program and procedures.

22.     Throughout the years, CenturyLink permitted various committees including its Audit Committee and its Risk Evaluation Committee to grant waivers to directors or executive officers from the code of ethics and business conduct contained in the Company's corporate compliance program and procedures.

23.     As of today, the Company's Corporate Governance Guidelines (accessible on the Company's website) allow the board of directors and authorized committees to waive the Company's policies, principles or guidelines relating to business conduct or ethics for executive officers or directors.

**B.      Material Misstatements and Omissions during the Class Period**

24.     The Class Period begins on March 1, 2013, when CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2012 ("2012 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the year the Company

reported operating revenues of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year; and adjusted net income of $1.66 billion, compared to adjusted net income of $1.63 billion in the previous year.

25.    With respect to the Company sales' practices, the 2012 10-K stated in pertinent part:

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. ***We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

\* \* \*

Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

***Our approach to our regional markets' business and government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings.*** Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and government customers.

***Our approach to our wholesale markets' customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.***

Our approach to our enterprise market—network customers includes a commitment to deliver network products and services that meet existing

7

and future customer needs by offering private line, broadband, MPLS and hosting services and well as local and long-distance services.

Our enterprise market—data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

Emphasis added.

26.     With respect to regulations and compliance, the 2012 10-K stated in relevant part:

**Regulation**

*We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications in our local service area.* These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region.

* * *

**Federal Regulation**

*We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition*.

Emphasis added.

27.     With respect to the Company's ethics, the 2012 10-K stated in relevant part:

*We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.* In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or

8

provide any waivers from, the provisions of our code of conduct applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC. These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at *www.centurylink.com/Pages/AboutUs/Governance/* or in print to any shareholder who requests them by sending a written request to our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink Drive, Monroe, Louisiana, 71203.

Emphasis added.

28.    On February 27, 2014, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2013 ("2013 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the year the Company reported operating revenues of $18.1 billion, compared to operating revenues of $18.4 billion in the previous year; and adjusted net income of $1.66 billion, comparted to adjusted net income of $1.66 billion in the previous year.

29.    With respect to the Company sales' practices, the 2012 10-K stated in pertinent part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. ***We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

\* \* \*

***Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence***. We market

our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

***Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through bundles of services and integrated service offerings***. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

***Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers*** through bandwidth growth and quality of services.

***Our data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals.*** We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

Emphasis added.

30.    With respect to regulations and compliance, the 2013 10-K stated in relevant part:

**Regulation**

***We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition,*** (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state

10

utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

* * *

**Federal Regulation**

**General**

***We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.***

Emphasis added.

31.     With respect to the Company's ethics, the 2013 reiterated the information stated in the 2012 10-K:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

32.     On February 24, 2015, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2014 ("2014 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the year the Company reported operating revenues of $18 billion, compared to operating revenues of $18.1 billion in the previous year; and adjusted net income of $1.49 billion, comparted to adjusted net income of $1.66 billion in the previous year.

33.     With respect to the Company sales' practices, the 2014 10-K stated in pertinent part:

**Sales and Marketing**

11

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. ***We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

***Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.*** We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties.

We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our approach to our business, wholesale and governmental customers includes a commitment to provide comprehensive communications solutions for small office, mid-sized and select enterprise business and governmental customers**. *We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties***. We also market through indirect channels, including collaboration with existing clients and technology providers, telecommunications companies and system integrators.

Emphasis added.

34.   With respect to regulations and compliance, the 2014 10-K stated in relevant part:

**Regulation**

***We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition,*** (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer

assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

\* \* \*

**Federal Regulation**

**General**

***We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms***, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

Emphasis added.

35.    With respect to the Company's ethics, the 2014 10-K stated in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

36.    On February 25, 2016, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the year the Company reported operating revenues of $17.9 billion, compared to operating revenues of $18 billion in the previous year; and adjusted net income of $1.5 billion, comparted to adjusted net income of $1.49 billion in the previous year.

37.    With respect to the Company sales' practices, the 2015 10-K stated in pertinent part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. ***We also rely on our call center personnel and***

13

*a variety of channel partners to promote sales of services that meet the needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands.* Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

\* \* \*

*Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms.* We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

*Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers.* Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

Emphasis added.

38.    With respect to regulations and compliance, the 2015 10-K stated in relevant part:

**Regulation**

\* \* \*

*We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition,* (ii) set the rates that telecommunication companies charge

each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

* * *

**Federal Regulation**

**General**

***We are required to comply with the Communications Act of 1934. Among other things, this law requires our ILECs to offer various of our legacy services at just and reasonable rates and on non-discriminatory terms***. The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

Emphasis added.

39.     With respect to the Company's ethics, the 2015 10-K stated in relevant part:

We have adopted a written code of conduct that serves as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

40.     On February 23, 2017, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by the Individual Defendants. For the year the Company reported operating revenues of $17.5 billion, compared to operating revenues of $17.9 billion in the previous year; and adjusted net income of $1.3 billion, comparted to adjusted net income of $1.5 billion in the previous year.

41.     With respect to the Company sales' practices, the 2016 10-K stated in pertinent part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. ***We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the***

15

*needs of our customers. Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands*. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

\* \* \*

*Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms.* We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

*Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers.* We strive to offer our business customers stable, reliable, secure and trusted solutions. *Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms*. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

Emphasis added.

42.     With respect to regulations and compliance, the 2016 10-K stated in relevant part:

**Regulation**

\* \* \*

*We are subject to significant regulation by the FCC, which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition,* (ii) set the rates that telecommunication companies charge each other for exchanging traffic,

16

and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

* * *

**Federal Regulation**

**General**

***We are required to comply with the Communications Act of 1934. Among other things, this law requires our incumbent local exchange carriers ("ILECs") to offer various of our legacy services at just and reasonable rates and on non-discriminatory terms.*** The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

Emphasis added.

43.    With respect to the Company's ethics, the 2016 10-K stated in relevant part:

We have adopted a written code of conduct that serves as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

44.    The statements in paragraphs 24-43 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (1) CenturyLink policies' had engaged the Company in unlawful business practices by allowing its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (2) accordingly, the Company's revenues contained ill-gotten gains that originated from the Company's illicit conduct and were unsustainable; and (3) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; and (4) as a result of the foregoing, Defendants' statements about CenturyLink's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

17

C.    **The Truth Emerges**

45.    On June 16, 2017, reporters Polly Mosendz and Scott Moritz from Bloomberg

wrote an article entitled "*CenturyLink Is Accused of Running a Wells Fargo-Like Scheme.*" The

article described Defendant CenturyLink's unlawful business practices, stating in relevant part:

> *A former CenturyLink Inc. employee claims she was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left customers paying millions of dollars for accounts they didn't request,* according to a lawsuit filed this week in Arizona state superior court
>
> The company's shares fell the most in six weeks on the news, while the shares of merger partner Level 3 Communications Inc. also dropped sharply.
>
> The plaintiff, Heidi Heiser, worked from her home for CenturyLink as a customer service and sales agent from August 2015 to October 2016. The suit claims she was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board.
>
> *The complaint alleges CenturyLink "allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services." This would sometimes result in charges that hadn't been authorized by customers, according to the complaint.*
>
> CenturyLink, of Monroe, La., is in the midst of a $34 billion merger with Level 3 Communications Inc., whose CEO, Jeff Storey, will become chief of CenturyLink in 2019 as the company goes up against powerhouses such as AT&T Inc. in bidding for businesses' heavy internet traffic. CenturyLink, which provides communications and data services nationwide and offers hosting, cloud, and information technology services, booked $816 million in net income on $17.5 billion in sales last year.
>
> Shares of CenturyLink closed down 4.6 percent at $25.72 after trading down about 7 percent earlier in the session, in their biggest intraday decline since May 4. Level 3 shares ended down 2.8 percent at $62.03. CFRA cut its recommendation on shares of CenturyLink to hold from buy.
>
> CenturyLink "holds itself and its employees to the highest ethical standards" and has "an Integrity Line in place, 24 hours a day, seven days

a week," Mark Molzen, a spokesman, said in a statement. "This employee did not make a report to the Integrity Line and our leadership team was not aware of this matter until the lawsuit was filed. We take these allegations seriously and are diligently investigating this matter."

***Heiser's complaint alleges that she became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September.*** In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

***The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to "many millions" of dollars.*** She says her concerns were bolstered by posts she had read on review websites.

A review of Yelp and Pissed Consumer finds evidence of irate customers. "They signed me up unauthorized,' wrote Sierrah U. of Bend, Ore., on Yelp in February 2015. "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me. Two weeks later I receive a bill! With a ton a fees, I don't even have internet with them!"

***When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service," according to the complaint, and as a result "it was really the customer's word against CenturyLink."***

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

***Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again," according to the complaint.*** Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

***Five months before she was fired, Heiser said, she experienced dropped calls with customers due to what the complaint described as a "malfunctioning system." She reported the issue repeatedly to superiors,***

19

***according to the complaint. The dropped calls were allegedly cited by CenturyLink as the reason for her dismissal, which came two days after the question-and-answer session.***

To lead the combined operations of CenturyLink and Level 3, activist investor Keith Meister's hedge fund, Corvex Management LLP, had sought a telecom veteran, prevailing with Storey's selection. (Meister says Corvex has built up a 5.5 percent stake in CenturyLink.) Still, Post, the current CEO, will stay on as executive chairman when Storey takes the helm.

Phone service giants such as AT&T Inc., Verizon Communications Inc., and Sprint have all settled cases in which third-party companies had been adding services to customers' phone bills without consent. These "cramming" issues typically involved $9.99 monthly charges for horoscopes and trivia games. That is different from a telephone company employee who may be looking to meet sales goals by creating false accounts or adding services to existing accounts without the subscriber's knowledge or consent.

T-Mobile U.S. Inc. was the subject of a critical report in December from a labor group called Change to Win Retail Initiatives that said the carrier put its sales staff under pressure to meet difficult sales goals. The pressure caused T-Mobile employees to force some customers to enroll in services they didn't necessarily want or authorize, according to the report. T-Mobile declined to comment on the allegation.

***"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst. "Companies have the responsibility to make sure the goals are realistic. You don't want to drive people to break the law."***

Emphasis added.

46.    On this news, the Company's share price declined from $26.95 per share of CenturyLink stock on June 15, 2017, to close at $25.72 per share on June 16, 2017, *a drop of approximately 4.5%.*

47.    On June 19, 2017, the Bloomberg reporters wrote a second article "*CenturyLink Faces Class-Action Lawsuit Seeking Up to $12 Billion.*" The article stated in relevant part:

*The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's suit, as well as similar accusations posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.*

*"Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."*

"The fact that a law firm is trying to leverage a wrongful termination suit into a putative class action lawsuit does not change our original position," Mark Molzen, a CenturyLink spokeman, said in a statement, adding that Heiser failed to report her allegations to the company's 24-hour Integrity Line. He said her claims "are completely inconsistent" with company policy and culture and that "we take these allegations seriously and are diligently investigating this matter."

Class actions are common after contentious allegations against large companies. Sunday's lawsuit was brought on behalf of the consumers by the Geragos & Geragos law firm, led by celebrity attorney Mark J. Geragos. Heiser didn't report her concerns to the Federal Communications Commission or other authorities.

The named plaintiffs in the case are Craig McLeod and Steven L. McCauley, both current customers of CenturyLink. *During a conversation in early April with a sales agent on CenturyLink's website, McLeod, 65, was offered a faster internet link for an extra $2 a month with a two-year contract, and accepted, according to the complaint. He alleges he incurred considerably higher fees than quoted and was charged for a repair that never was made.*

Emphasis added.

## ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, Defendants acted with scienter in that they knew that the public

documents and statements issued or disseminated in the name of the Company were materially

false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CenturyLink, their control over, and/or receipt and/or modification of CenturyLink's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning CenturyLink, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

49.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about CenturyLink's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in CenturyLink's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

50.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of CenturyLink's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing CenturyLink's common stock to be artificially inflated. Plaintiff and other Class members purchased CenturyLink's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

51.     At all relevant times, the market for CenturyLink common stock was an efficient market for the following reasons, among others:

(a) CenturyLink common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b) During the Class Period, CenturyLink common stock were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, CenturyLink filed with the SEC periodic public reports during the Class Period;

(d) CenturyLink regularly communicated with public investors via established market communication mechanisms;

(e) CenturyLink was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was

publicly available and entered the public marketplace; and

(f) Unexpected material news about CenturyLink was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

52.     As a result of the foregoing, the market for CenturyLink common stock promptly digested current information regarding CenturyLink from all publicly available sources and reflected such information in CenturyLink's stock price. Under these circumstances, all purchasers of CenturyLink common stock during the Class Period suffered similar injury through their purchase of CenturyLink's common stock at artificially inflated prices, and a presumption of reliance applies.

53.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in CenturyLink.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

55.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the purportedly forward-looking statements.

56.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of CenturyLink who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired CenturyLink common stock on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

58.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CenturyLink securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CenturyLink or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 5, 2017, CenturyLink had more than 548 million outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

59.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

60.    Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)    whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)    whether the price of CenturyLink securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

63.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase CenturyLink common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

65.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for CenturyLink securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

27

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CenturyLink as specified herein.

67.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CenturyLink's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CenturyLink and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CenturyLink common stock during the Class Period.

68.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

69.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CenturyLink's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

70.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CenturyLink's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of CenturyLink's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired CenturyLink' common stock during the Class Period at artificially high prices and were or will be damaged thereby.

71.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding CenturyLink's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CenturyLink securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

72.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

74.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of common stock giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of CenturyLink within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the

30

decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

77.      In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

78.      As set forth above, CenturyLink, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

79.      By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

80.      This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

      (a)      Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel

as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: June 22, 2017                    /s/ Adam M. Apton
                                        **LEVI & KORSINSKY, LLP**
                                        Nicholas I. Porritt
                                        Adam M. Apton
                                        30 Broad Street, 24th Floor
                                        New York, NY 10004
                                        Tel: (212) 363-7500
                                        Fax: (212) 363-7171
                                        Email:nporritt@zlk.com
                                        Email:aapton@zlk.com

                                        *Counsel for Plaintiff Benjamin Craig and Proposed Lead Counsel for the Class*